**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| NATIONAL HEALTHCARE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:14-cv-02015 |
| | ) | JUDGE CAMPBELL |
| BILL W. BARKER and SHERRY A. BARKER, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court are motions for partial summary judgment filed by defendants Bill W.

Barker and Sherry A. Barker (collectively, the "Barkers") (Doc. No. 18) and by plaintiff National

Healthcare Corporation ("NHC") (Doc. No. 19). For the reasons set forth herein, the Court will deny

the Barkers' motion and grant in part and deny in part NHC's motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts are relevant and undisputed—unless otherwise noted—for purposes of

both motions for partial summary judgment.

NHC is a Delaware corporation principally headquartered in Murfreesboro, Tennessee and

primarily engaged in the operation of nursing homes. Defendants Bill Barker and Sherry Barker are

citizens of Bowling Green, Kentucky. The Barkers own and lease residential and commercial

properties in Warren County, Kentucky and Sumner County, Tennessee.

On August 21, 2008, NHC and the Barkers entered into a lease (the "Original Lease")

pursuant to which the Barkers would lease from NHC property located at 672 West Main Street,

Hendersonville, Tennessee (the "Property"), as fully described in Exhibit A to the Original Lease, for a period of one year. (*See* Original Lease, Doc. No. 22-2, at 165–79.) The Property consists of three tracts, on which there are several structures, including a former nursing home, a house, a garage, and various outbuildings. Prior to executing the Original Lease, the Barkers had the opportunity to review it and to inspect the Property. The Barkers entered into the Original Lease freely and voluntarily. During the one-year lease term of the Original Lease, the Barkers were required to make monthly rent payments of $6,000 to NHC.

NHC had purchased the Property in 2007 to obtain the nursing home license associated with it, which NHC later transferred. NHC never operated a nursing home on the Property. The Barkers originally intended to purchase the Property from NHC and convert it to a daycare center. However, when the Barkers were unable to secure financing to purchase the Property, the parties agreed to enter into the Original Lease instead, to allow the Barkers to take possession of the Property and begin converting it. The Barkers believed that converting the Property and getting the daycare center up and running during the lease term would enable them to secure the necessary financing to purchase the Property.

In March 2009, the Barkers approached NHC about amending the Original Lease to extend the lease term. On April 1, 2009, the parties amended the Original Lease by signing a First Amendment to Lease Agreement ("Lease Amendment"). (Lease Amendment, Doc. No. 22-2, at 180–85.) (The Original Lease and Lease Amendment are referred to hereafter, collectively, as the "Lease.") The Barkers had an opportunity to review and negotiate the terms of the Lease Amendment prior to executing it, and they entered into the Lease Amendment freely and voluntarily.

Paragraph 1 of the Lease Amendment modified Section 2.1 of the Original Lease by extending the lease term "through and including March 31, 2014." (Lease Amendment ¶ 1, Doc. No.

22-2, at 180.) Paragraph 2 of the Lease Amendment modified Section 3 of the Original Lease, pertaining to rent payments. Under the Lease Amendment, the Barkers were to pay monthly rent to NHC in the amounts set forth in Exhibit A to the Lease Amendment (Rent Schedule, Doc. No. 22-2, at 185), which began at $6,000 per month and increased over time up to $6,763 per month during the final year of the lease term. The Lease Amendment provides that rent payments were due on the first day of each calendar month; it also imposes a five-percent late charge on monthly rent payments submitted after the fifth day of the month on which the payment was due. Further, the Lease Amendment provides for interest on past-due rent, "upon demand, and at Lessor's [NHC's] election," at the prime rate of interest as published by The Wall Street Journal plus four percent (4%) per annum. (Lease Amendment ¶ 2, Doc. No. 22-2, at 180.) The parties do not dispute that the prime rate as published by the Wall Street Journal throughout the relevant time frame has been 3.25%.

The Barkers failed to pay rent for the months of January 2013, March 2013, July 2013, September 2013, November 2013,[1] January 2014, February 2014, and March 2014. Under the Rent Schedule, the total monthly rent owed by the Barkers to NHC for the months of January 2013 ($6,555), March 2013 ($6,555), July 2013 ($6,753), September 2013 ($6,753), November 2013 ($6,753), January 2014 ($6,753), February 2014 ($6,753), and March 2014 ($6,753) was $53,628. The Barkers do not dispute that they were aware of their obligation to pay rent and aware of their late and missed monthly rent payments.

In addition to missing payments entirely as set forth above, the Barkers submitted the rent payment for April 2012 ($6,555) after April 5, 2012. The Barkers did not pay late fees in connection

---

[1] The Barkers submitted one installment of monthly rent by check dated November 12, 2013, which NHC deposited on or about December 17, 2013 and applied to the rent due for December 2013. The Barkers did not submit any other payment of monthly rent for December 2013 (or November 2013) and do not now dispute that they failed to pay rent for November 2013.

with the late or unpaid monthly rent for April 2012, January 2013, March 2013, July 2013, September 2013, November 2013, January 2014, February 2014, and March 2014. NHC asserts that the Barkers owe $3,009.15 in late fees. The Barkers do not dispute NHC's calculation of the late fees but deny that NHC ever assessed or demanded late fees during the lease term. The Barkers assert that NHC has therefore waived its right to collect late fees.

The Lease defines the term "Event of Default" to include the Barkers' failure to perform any Lease obligation, if the failure continues for thirty days after receiving written notice of such failure. (Lease ¶ 15.1(i).) The Lease further states that, upon the occurrence of an Event of Default, NHC has the "right to pursue any remedies available . . . under applicable law including a claim for compensatory damages against [the Barkers] as a result of such Event of Default." (Lease ¶ 15.2(a).) The Lease explicitly provides that the Barkers' liabilities and obligations under the Lease survive its expiration. (Lease ¶ 15.2(b).)

The Lease Amendment also specifically provides that all provisions of the Original Lease not amended remain in effect:

> Except as amended by this Amendment the Lease is not otherwise amended, and the Lease remains in full force and effect, as amended hereby. In the event of a conflict between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall control.

(Lease Amendment ¶ 8, Doc. No. 22-2, at 183.)

The Lease Amendment does not purport to modify Section 4.2 of the Original Lease, which made the Barkers responsible for payment of real estate taxes during the lease term. This provision states in pertinent part as follows:

> 4.2     Taxes and Utilities. Beginning on the first (1st) day of the third (3rd) month of the Lease Term and continuing throughout the remainder of the Lease Term, Lessee [the Barkers] shall pay, prior to delinquency: (i) all taxes, assessments, levies, fees, . . . and all other governmental charges, general and special, ordinary

and extraordinary, foreseen and unforeseen, which are during the Lease Term, imposed or levied upon or assessed against . . . the Premises . . . . Lessee will furnish to Lessor, promptly after demand therefore, proof of payment of all items referred to above which are payable by Lessee. If any such assessment may be legally paid in installments, Lessee may pay such assessment in installments; in such event, Lessee shall be liable only for installments which become due and payable during the Lease Term.

All ad valorem real estate taxes which are due and payable within one year after the expiration of the Lease Term shall be prorated as of the date of expiration of the Lease Term, on the basis of the fiscal year with respect to which such taxes are assessed, and assuming that such taxes are payable in arrears. Lessee shall be responsible for and shall pay the portion of such taxes relating to the periods within the Lease Term.

(Lease ¶ 4.2, Doc. No. 22-2, at 166–67.)

The Barkers took possession of the Property on or about August 21, 2008, and the Lease was terminated on March 31, 2014. During the entire lease term, NHC never sent notice to the Barkers that property taxes were owed or in what amount.

On May 1, 2014, NHC sent the Barkers written notice (the Demand Letter) that the lease was in default at the time of termination and demanding payment of past due rent totaling $60,381, unpaid late fees in the amount of $3,009.15, and property taxes from November 2008 through December 2013 in the amount of $94,972.05. (Barker Dep. Ex. 12, Doc. No. 22-2, at 249.) Mr. Barker responded with a letter dated May 12, 2014, acknowledging "shortcomings regarding our initial agreement" and requesting another extension of the lease term. (Barker Dep. Ex. 13, Doc. No. 22-2, at 250.) The Barkers never objected verbally or in writing to their obligation to pay the property taxes, including in Mr. Barker's May 12 letter.

The Barkers did not submit payment of the outstanding rent payments, late charges, or property tax after receiving the Demand Letter.

Regarding the property taxes, the Barkers point out that there were numerous discussions and

exchanges between the parties during the course of their business relationship, but at no time prior to May 1, 2014 did NHC notify the Barkers that they were in breach of an obligation to pay property taxes. They point out, for instance, that prior to entering into the Lease Amendment, the parties had discussions relating to the amendment. NHC agreed to amend the Original Lease in 2009 even though the Barkers had not paid any property taxes for 2008. At one point, NHC sent the Barkers a letter relating to a water bill that had erroneously been sent to NHC for payment rather than to the Barkers. In December 2008, NHC sent a letter to the Barkers about an electricity bill that had mistakenly been sent to NHC instead of the Barkers. In February 2011, NHC sent the Barkers notice regarding the escalation of rent payments. In addition, as discussed above, NHC sent the Barkers notice that rent was late on eight different occasions between March 2009 and July 2012. In none of these letters and notices was the Barkers' obligation to pay property taxes mentioned.

NHC received tax notices at its home office in Murfreesboro for property taxes related to the Property and paid such taxes directly to the city of Hendersonville, Tennessee for the years 2008, 2009, 2010, 2011, 2012, 2013, and 2014, in the total amount of $94,972.05. NHC asserts that its failure to forward property tax notices to the Barkers or otherwise demand payment for property taxes until May 1, 2014 was "[d]ue to an accounting oversight." (Pl.'s Statement of Additional Undisp. Facts ¶ 20, Doc. No. 27 (citing Smith Dep. 37:2–14, Doc. No. 22-3).) In the cited deposition, however, when Jeffrey Smith, NHC's Vice President of Treasury, was asked if he knew why the tax notices were not forwarded or otherwise communicated to the Barkers prior to May 1, 2014, he responded that he *thought* it was accounting oversight. (Smith Dep. 37:2–14.) He had previously explained that he was not aware of any other properties owned by NHC in the same situation as the one leased to the Barkers, where NHC was not "handling the books" for the property or doing anything else for the particular property. (Smith Dep. 36:3–16.) It is not clear from the

record whether Mr. Smith had personal knowledge as to why the tax notices were not forwarded to the Barkers at the time they were sent to NHC, or whether he simply presumed that it was an accounting oversight. Mr. Smith was not involved in the process of negotiating or executing the Original Lease or the Lease Amendment. (Smith Dep. 14:10–16; 19:2–14.) He testified that the account was passed to him sometime in 2013 when it was already "deemed a problem." (Smith Dep. 34:2–5.) He stated that he prepared the Demand Letter "because the Barkers met with me, or Mr. Barker did, and wanted to renew the lease. I said, I cannot renew a lease that's in default." (Smith Dep. 34:7–10.)

Mr. Barker testified in his deposition that he was aware that he was obligated under the Lease to pay taxes on the Property but that he did not pay them because he did not receive any notices about paying them. (Barker Dep. 53:14–16.) He believed that "maybe those monies were coming out of the monthly leases" and being escrowed. (Barker Dep. 78:15–23; *see also id.* at 53:7–10.) He also testified that if NHC had submitted the tax notices to him when they were due toward the beginning of the lease term, he "probably" would have had the "financial wherewithal" to pay them, but he likely would not have been able to pay the property taxes assessed against the Property toward the end of the lease term. (Barker Dep. at 82:5–10.)

NHC brought this diversity breach-of-contract action in 2014, alleging that the Barkers had breached a lease-purchase agreement relating to premises located in Hendersonville, Tennessee by failing to make timely rent payments, failing to pay late charges and interest on the late rent payments, and failing to pay taxes assessed against the property. NHC seeks damages for breach of contract in excess of $150,000, as well as attorney fees and costs.

In October 2015, both parties filed motions for partial summary judgment. NHC seeks judgment in its favor as a matter of law on its claims for unpaid rent, late charges, property taxes,

interest, and attorney fees.[2] The Barkers deny that NHC is entitled to judgment in its favor on its claims for late charges, property taxes, and late fees. In their own motion, they seek partial summary judgment in their favor on the issue of whether NHC is barred by the doctrines of waiver and estoppel from enforcing the provision in the Lease obligating the Barkers to pay property taxes. Both motions have been fully briefed and are ripe for review.

## II.     SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). A fact is material if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the Court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp.*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court must review all the evidence, facts

---

[2] NHC does not seek summary judgment on its claim for damages arising from the Barkers' alleged breach of the agreement to purchase the property that was the subject of the lease-purchase agreement.

and inferences in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Van Gorder v. Grand Trunk W.R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249. The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to defeat summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. *Id.* at 251.

Finally, the standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## III.    ANALYSIS AND DISCUSSION

### A.    Cross-Motions for Partial Summary Judgment: The Property-Tax Claim

In their own Motion for Partial Summary Judgment and in response to NHC's motion, the Barkers argue that NHC is barred either by waiver or equitable estoppel from enforcing the Lease provision requiring the Barkers to pay taxes on the Property. NHC responds that neither waiver nor estoppel applies under the facts of this case. NHC also posits that the doctrine of laches might apply but that the Barkers failed to raise laches as an affirmative defense and are barred by the applicable rules of civil procedure from raising it now. In their reply brief, the Barkers insist that waiver and estoppel apply but also argue that they did not waive the application of laches by failing to state the

word "laches" in their answer, where the "substance of the defense" was raised. (Doc. No. 32, at 6.) They maintain that the Court may apply the doctrine of laches if the Court finds it appropriate.

### 1. Equitable Estoppel

Under Tennessee law, estoppel is an affirmative defense that must be pleaded by the party asserting it. Tenn. R. Civ. P. 8.03. The party asserting the defense bears the burden of proof. *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 723 (Tenn. Ct. App. 1998). The Tennessee Supreme Court has defined the "essential elements" of equitable estoppel, as they pertain to the party against whom estoppel is asserted, as:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; [and] (3) Knowledge, actual or constructive[,] of the real facts.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 315–16 (Tenn. 2009) (citations omitted); *see also Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (same). The elements of equitable estoppel pertaining to the party asserting estoppel are:

> (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Osborne*, 130 S.W.3d at 774 (citations omitted); *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984); *Gitter v. Tenn. Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 783 (Tenn. Ct. App. 1969).

"[T]here can be no estoppel where both parties have the opportunity and means of ascertaining the truth." *Escue v. Lux Time Div. of Robertshaw Controls*, 472 S.W.2d 228, 229 (Tenn. 1971) (citing *Rambeau v. Farris*, 212 S.W.2d 359, 361 (Tenn. 1948)). And generally, the mere failure to act or "delay in asserting a legal right does not of itself work an estoppel." *E&A Ne. Ltd.*

*P'ship. v. Music City Record Distribs.*, M2005-01207-COA-R3-CV, 2007 WL 858779, at *8 (Tenn.

Ct. App. March 21, 2007) (quoting *Johnson v. De Soto Hardwood Flooring Co.*, 67 S.W.2d 143, 144

(Tenn. 1934)). For silence or inaction to give rise to estoppel, the party against whom estoppel is

sought must have had, not only an opportunity to speak or act, but also an obligation or duty to do

so. *Id.* (citations omitted).

In their memorandum in support of partial summary judgment, the Barkers assert only that

it is "clear" from the undisputed facts that:

> the doctrine of equitable estoppel should be employed. Defendants did not have the
> means to determine what the taxes were as the tax bills were being sent directly to
> [NHC]. Further, as Mr. Barker testified, he relied on the conduct of [NHC] paying
> the bill and not advising of any outstanding amounts.

(Doc. No. 18-1, at 10.) In other words, the Barkers maintain that NHC had an obligation to inform

them of the tax notices and that they relied on NHC's conduct in agreeing to modify the Lease and

failing to provide notice that taxes were due during the lease term, though they did notify the

Barkers regularly of other payments that were due. For the same reasons, the Barkers insist that they

had no obligation to call NHC to inquire about the property taxes:

> [T]he undisputed facts show within months of signing the initial lease, the lease was
> amended and thereafter there [were] approximate ten (10) communications between
> the parties, all related to either outstanding amounts due under the lease or bills that
> ha[d] been mistakenly sent to NHC instead of the [Barkers]. Therefore, there was no
> reason for the Barkers to question whether or not the rent [sic] was outstanding
> because the Barkers reasonabl[y] surmised that without receiving these bills along
> with the other request[s] for payment, the taxes were not due. Thus, the Barkers'
> actions do not constitute "willful ignorance"[;] such constitutes reasonable reliance
> on the actions of NHC, which is the essence of estoppel.

(Doc. No. 32, at 2.)

In response, NHC asserts that the Barkers cannot establish innocence or reasonable reliance,

because they were actually aware that the Lease placed upon them the obligation to pay property

taxes. They argue that, although Mr. Barker indicated that he was unsure about the status of payment of those taxes—he thought that some portion of the rent payment might be going toward property taxes—the Barkers were not confused about whose obligation it was to pay the taxes. NHC also claims that its silence about the taxes and failure to send notices, standing alone, has not been shown to be in bad faith and therefore does not constitute the type of conduct upon which it was reasonable to rely. (Doc. No. 26, at 4 (citing *Walter Bledsoe & Co. v. Elkhorn Land Co.*, 219 F.2d 556, 559 (6th Cir. 1955) (applying Kentucky law)).)

For purposes of the Barkers' Motion for Partial Summary Judgment, the Court finds, first, that there is a question of fact as to whether the Barkers had the means of ascertaining the truth about whether they owed property taxes. Second, the Barkers have not affirmatively shown that they relied to their detriment on NHC's conduct. It is certainly conceivable that, for instance, the Barkers would not have agreed in April 2009 to extend the lease term if they had known they were already in arrears and responsible for taxes for the year 2009, that they would have sought to terminate the Lease sooner if they had known they were responsible for a substantial sum of property taxes, or that they would have allocated funds toward the payment of real estate taxes instead of toward additional improvements to the Property. On the basis of these findings alone, the Court finds that the Barkers are not entitled to summary judgment in their favor on the basis of their equitable-estoppel defense.

Likewise, however, for purposes of NHC's Motion for Partial Summary Judgment on the issue of the Barkers' liability for the property taxes, inferences may be drawn from the undisputed facts in the Barkers' favor regarding whether NHC had an affirmative obligation to notify the Barkers about the property tax, that its silence in that regard was misleading, and that the Barkers' reliance on that conduct was reasonable. The Court will deny NHC's motion on this issue as well.

### 2. *Waiver*

Waiver, like estoppel, is an affirmative defense, Tenn. R. Civ. P. 8.03, and the party asserting it bears the burden of proof. *Jenkins Subway*, 990 S.W.2d at 722. Tennessee courts have repeatedly and consistently defined waiver as "an intentional relinquishment of a known right." *See, e.g.*, *E&A Ne. Ltd. P'ship. v. Music City Record Distribs.*, M2005-01207-COA-R3-CV, 2007 WL 858779, at *6 (Tenn. Ct. App. March 21, 2007); *Ky. Nat'l Ins. Co. v. Gardner*, 6 S.W.3d 493, 498 (Tenn. Ct. App. 1999); *Jenkins Subway*, 990 S.W.2d at 723; *Baird v. Fidelity–Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942). Waiver may be proved by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage." *Baird*, 162 S.W.2d at 389. In addition, though waiver is considered an "intentional" act, it may also be proven "by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive." *Id.* In order to establish waiver by conduct, the party asserting the defense must present proof of some "'absolute action or inaction inconsistent with the claim or right' waived." *Koontz v. Fleming*, 65 S.W.2d 821, 825 (Tenn. Ct. App. 1933). The acts or course of conduct referred to "must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver." *Gitter v. Tenn. Farmers Mutual Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969); *accord Webb v. Board of Trustees of Webb School*, 271 S.W.2d 6, 19 (Tenn. Ct. App. 1954) ("[I]t is said that the waiver must be intended by one party and so understood by the other."). In addition, it is generally understood that, "by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach." *94th Aero Squadron of Memphis, Inc. v. Memphis–Shelby Cty. Airport Auth.*, 169 S.W.3d 627, 635–36 (Tenn. Ct. App. 2004) (citing 17 Am. Jur. 2d Contracts § 447 (1964)).

The facts supporting the parties' respective positions are, again, basically undisputed, but conflicting inferences can be drawn from those facts. On one hand, drawing all inferences in favor

of NHC for purposes of reviewing the Barkers' motion, a reasonable jury could conclude that the Barkers willfully chose not to inquire about why they were not receiving property tax notices and that the Lease made it fairly clear that no portion of the lease payment was being allocated toward property taxes. On the other hand, a reasonable jury could also conclude from the facts presented that NHC, by negotiating and agreeing to an extension of the lease term and other amendments to the Lease in 2009 without requiring payment of any portion of the property taxes due for 2008, and by regularly forwarding bills, notices of late payment, and other communications to the Barkers—but failing to forward the property tax notices or to demand payment of the property taxes for a period of more than five years—engaged in "a course of acts and conduct, or . . . so neglect[ed] and fail[ed] to act, as to induce a belief that it was [NHC's] intention and purpose to waive" its contractual right to require the Barkers to pay the property taxes.[3] *Baird*, 162 S.W.2d at 389. A reasonable jury could conclude that NHC's conduct constitutes "absolute . . . inaction inconsistent with the claim or right waived." *Koontz*, 65 S.W.2d at 825. *Cf. Chattem*, 676 S.W.2d at 955–56 (where the defendant insurance company had waived the right to demand strict enforcement of a timeliness requirement in seven out of eleven claims previously submitted by the plaintiff, holding that "[t]he defendant's course of conduct and its own admissions conclusively establish that it knowingly and voluntarily waived" the right to demand strict enforcement of the timeliness requirement in the case at bar)*; Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 814 & n.10 (Tenn. Ct. App. 2009) (where the plaintiff argued that the defendant's "acceptance of performance for nearly eight months constituted waiver of any breach that occurred due to [the

_____

[3] The testimony of Tom Campbell, the Barkers' "point of contact [at NHC] from the beginning . . . throughout until the . . . very end of the Lease" (Barker Dep. 23:19–21) is not in the record.

14

plaintiff's] earlier suspension of performance," finding that the defendant's "continued acceptance of performance on the contract amounted to the type of 'clear, unequivocal, and decisive act[s]' required to establish waiver").[4]

The Court, in sum, finds that neither party has established entitlement to judgment as a matter of law on the question of waiver.

### 3. Laches

In their response to the Barkers' motion, NHC points out that the defense of laches, unlike waiver, does not require a showing of intent. (Doc. No. 26, at 8 (citing *Lasater v. Hawkins*, No. M2010-01495-COA-R3-CV, 2011 WL 4790971, at *7 (Tenn. Ct. App. Oct. 10, 2011).) Rather, "[a] judgment based on laches 'is predicated on the trial court's finding of inexcusable, negligent, or unreasonable delay on the party asserting the claim which results in prejudice to the defending party. It is an equitable defense which requires the finder of fact to determine whether it would be inequitable or unjust to enforce the claimant's rights." *Lasater*, 2011 WL 4790971, at *7 (citing *Finova Capital Corp. v. Regel*, 195 S.W.3d 656, 660 (Tenn. Ct. App. 2005); *Gleason v. Gleason*, 164 S.W.3d 588, 592 (Tenn. Ct. App. 2004)).

---

[4] In *Hilltop Hideaway, Inc. v. P.L.B., Inc.*,No. 01-A-01-9008-CH-00299, 1991 Tenn. App. LEXIS 22 (Tenn. Ct. App. Jan. 11, 1991), the Tennessee appellate court held, in an unpublished decision, that a lessor's failure to submit a claim for reimbursement of property tax increases from the lessee, as authorized by the lease, for a period of more than six years, did not constitute waiver. The court in that case observed that the proof in the record was "very minimal" but concluded that the "mere failure to claim the benefit of reimbursement" did not manifest an intent to waive that benefit for purposes of establishing waiver. *Id.* at *5–6. The facts in *Hilltop Hideaway* are sufficiently different from those in this case that the Court finds that it is not controlling here. There, the plaintiff affirmatively testified that he forgot about the right to request reimbursement but sent the demand as soon as he remembered. In the case at bar, Jeffrey Smith testified that he "believed" the failure to forward the notices was the result of accounting oversight, but he did not actually know and was not involved with the account during the relevant time frame. In addition, there was no evidence in *Hilltop Hideaway* of other communications regarding amounts owed under the lease.

The point NHC apparently intends to make is that, "without conceding its application," the conduct about which the Barkers complain "more closely resembles laches than waiver or estoppel," and that each of these defenses is analytically distinct. (Doc. No. 26, at 8.) NHC asserts, however, that because the Barkers did not plead laches or raise it in their Motion for Partial Summary Judgment, they are barred from doing so now. The Barkers, in response, invite the Court to apply the doctrine of laches if the Court finds it appropriate to do so. (Doc. No. 32, at 6.) The Barkers also dispute NHC's contention that the failure to plead laches in their answer bars them altogether from pursuing this defense and argue that "the substance of the defense" is pleaded in the answer. (*Id.*)

The Court finds for purposes of the Barkers' Motion for Partial Summary Judgment that the defendants have waived the ability to seek judgment on the basis of laches by addressing it for the first time it in their reply brief. *Cf. Gentry v. Hersey Co.*, 687 F. Supp. 2d 711, 718 (M.D. Tenn. 2010) (finding that it was "too late" for a party to assert an affirmative defense for the first time in response to a motion for summary judgment). Moreover, raising the issue in a reply brief with no recitation of the appropriate legal standard or application of that standard to the facts in the record does not satisfy the defendants' summary judgment burden.

The finding that the defense is waived at this stage in the proceedings, however, is not dispositive of the question of whether the defendants have the ability to amend their answer or to assert the defense at trial. *See Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 752 (6th Cir. 2015) ("As we [have] explained . . . , a waiver 'need not waive the defense for all purposes but would generally only waive the defense for the stage at which the defense should have been asserted.'" (quoting *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994)); *English*, 23 F.3d at 1090 ("Thus, for example, a defendant who fails to timely assert the defense prior to discovery may waive the right to avoid discovery but may nonetheless raise the issue after discovery on summary judgment or at

trial."). This issue is not presently before the Court.

**B.**     **Plaintiff's Motion for Partial Summary Judgment: The Remaining Claims**

NHC also seeks judgment in its favor with respect to its claims for unpaid monthly rent and late charges, as well as interest on the amounts owed, referencing § 3 of the Lease, and attorney fees and costs incurred in connection with recovering these amounts, referencing § 6 of the Lease.

### 1.     *Past-Due Rent and Interest*

In their response to NHC's motion, the Barkers do not contest that they owe past-due rent in the amount of $53,628. The Barkers also do not appear to dispute that under ¶ 3.1 of the Lease, as amended, they are responsible for payment of interest on the past-due rent at the rate of 7.25% per annum. Accordingly, NHC is entitled to summary judgment in its favor as to the past-due rent in the amount of $53,628 plus interest at the rate of 7.25%.[5]

---

[5] The parties' filings do not address from what date interest should be assessed. Because the parties have not raised it, the Court does not reach that question.

### 2. Late Charges

NHC seeks summary judgment on its claim for late charges totaling $3,009.15 arising in connection with the untimely or completely missed rent payments for the months of April 2012, January 2013, March 2013, July 2013, September 2013, November 2013, January 2014, February 2014, and March 2014. The Barkers argue that NHC is barred by waiver or equitable estoppel from recovering late fees on the past-due rental amounts, on the basis that they never received any notice that late charges were owed until they received the Demand Letter in May 2014. (Doc. No. 24, at 2.) They also argue that, even if the Court finds that the late fees are payable, NHC should not be entitled to interest on the late fees.

### i. Equitable Estoppel

As discussed in greater detail above, to prove equitable estoppel, a party must show that, as a result of conduct by the other party, he has been induced to change his position for the worse, "in such a manner that it would operate as a virtual fraud upon him to allow the party by whom he has been misled to assert the right in controversy." *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998) (quoting *Baird v. Fidelity–Phenix Fire Ins. Co.*, 162 S.W.2d 384, 388 (Tenn. 1942)). In other words, estoppel requires proof of conduct by the party against whom estoppel is asserted that "induces the other party to change position to its detriment or injury in reliance on the estopped party's action or statement." *E&A Ne. Ltd. P'ship. v. Music City Record Distribs.*, M2005-01207-COA-R3-CV, 2007 WL 858779, at *7 (Tenn. Ct. App. March 21, 2007) (citing *Tenn. Asphalt Co. v. Purcell Enters., Inc.*, 631 S.W.2d 439, 444 (Tenn. Ct. App. 1982)).

The Barkers do not point to any proof in the record suggesting that they relied upon NHC's inaction in failing to assess late fees or that they in any sense changed their position to their detriment as a result of NHC's failure to demand payment of late fees prior to the Demand Letter.

Estoppel does not apply in this context.

ii.      *Waiver*

As discussed above, waiver is generally defined as "an intentional relinquishment of a known right." *See, e.g.*, *E&A Ne. Ltd. P'ship.*, 2007 WL 858779, at *6; *Jenkins Subway*, 990 S.W.2d at 723; *Baird*, 162 S.W.2d at 389. Waiver may be proved by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage." *Baird*, 162 S.W.2d at 389. In addition, though waiver is considered an "intentional" act, it may also be proven "by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive." *Id.* In order to establish waiver by conduct, the party asserting the defense must present proof of some "'absolute action or inaction inconsistent with the claim or right' waived." *Koontz v. Fleming*, 65 S.W.2d 821, 825 (Tenn. 1933). The acts or course of conduct referred to "must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver." *Gitter v. Tenn. Farmers Mutual Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969); *accord Webb v. Board of Trustees of Webb School*, 271 S.W.2d 6, 19 (Tenn. Ct. App. 1954) ("[I]t is said that the waiver must be intended by one party and so understood by the other.").

In this case, the record reflects that NHC sent letters to the Barkers giving notice that monthly rent payments were past-due on November 12, 2010, February 6, 2011, March 6, 2011, April 6, 2011, April 17, 2011, October 15, 2011, December 6, 2011, and January 6, 2012. (No. 22-2, at 260–68.) In none of these letters did NHC demand or reference a late fee, despite the unambiguous Lease provision authorizing the collection of late fees.[6] Mr. Barker testified that, with

_____

[6] A late notice was also sent in March 2009. Because the Lease Amendment authorizing a late charge of 5% went into effect on April 1, 2009, it would not have applied to the late payment

respect to each of these letters, he cured the default and submitted the rent due within thirty days of receipt of the letters. (Barker Dep. 83:1–20.) However, "towards the end," NHC stopped even sending a letter to tell him rent was late, even as he got further behind in rent payments. (Barker Dep. 83:21–84:2.)

The facts here are basically undisputed. First, the Lease, as amended, clearly states:

> If any monthly installment of Rent is not received by Lessor by the fifth (5th) day of the calendar month in which such payment is due and payable (the "Late Payment Date"), then Lessee shall pay to Lessor a late charge of five percent (5%) of the amount of such payment.

(Lease ¶ 3.1.) Second, the Barkers failed altogether to pay or were late in paying rent a number of times after this provision of the Lease went into effect. Third, NHC never demanded payment of late fees until the May 1, 2014 Demand Letter and even now does not demand payment of any late fees predating April 2012. And finally, the Barkers have not paid the late charges demanded by NHC.

The facts in the record, though basically undisputed, are relatively sparse. For instance, there is no testimony from NHC regarding the decisionmaking process, or lack thereof, concerning the assessment of late charges against the Barkers. And, although the facts in evidence are undisputed, the Court nonetheless finds that reasonable factfinders could draw different inferences from those facts. A reasonable juror could, but would not be required to, conclude from NHC's course of conduct, including sending at least eight letters in which it could have but did not assess a late charge and its decision not to demand late fees at all until after the Lease had terminated, that NHC intentionally waived its right to collect late charges. The Court will therefore deny NHC's motion for summary judgment on the issue of its entitlement to late fees on the basis that the issue presents matters for the jury to resolve.

---

for March 2009.

The Court does not reach the presently hypothetical question of whether the Barkers would be liable for interest on late fees and will deny summary judgment on that issue as well.

### 3. *Attorney Fees*

NHC argues that, under § 6 of the Lease, it is entitled to summary judgment on its claim for attorney fees in connection with this suit. In response, the Barkers contend that § 6 of the Lease refers to indemnification against third-party lawsuits and simply requires the Barkers to defend NHC against any such lawsuits.

First, insofar as NHC argues that the Barkers have waived any objection to the shifting of attorney fees except in connection with NHC's claims for late fees and property taxes, the Court rejects that proposition. Despite the heading of their response—"Plaintiff Is Not Entitled to Prejudgment Interest or Attorneys Fees with Respect to the Late Charges and the Property Taxes"—the defendants' actual argument is that Section 6 of the Lease "is clearly not applicable in this matter" as a whole. (Doc. No. 24, at 5.) As set forth below, the contract language and the law support the Barkers' position.

Section 6 of the Lease states, in pertinent part:

> Section 6. Indemnification.
>
> Lessee [the Barkers] shall defend all actions against Lessor [NHC] . . . with respect to, and shall pay, protect, indemnify and save harmless Lessor . . . from and against any and all liabilities, losses, damages, costs, expenses (*including reasonable attorney's fees and expenses*), causes of action, suits, claims, demands or judgments of any nature to which Lessor . . . may be subject (a) because of Lessor's estate in the [Property] . . . or (b) arising from (i) injury to or death of any person, or damage to or loss of property, on the [Property] or on adjoining sidewalks, streets or ways, or in any way occurring or arising connected with the use, condition or occupancy of any thereof, (ii) *a violation of this Lease*, [or] (iii) any act or omission of Lessee or its agents . . . .

(Lease § 6 (emphasis added).)

The interpretation of a written agreement is a question of law. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009); *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). Where no ambiguity exists, the presiding court must construe the contract as written, attributing the ordinary meaning to the words used, and neither party is to be favored in their construction. *Brown v. Tenn. Auto. Ins. Co.*, 237 S.W.2d 553, 554 (Tenn. 1951). The question presented here is whether this Lease provision authorizes NHC to recover its attorney fees in connection with its suit against the Barkers for breach of the Lease.

Tennessee adheres to the "American rule" for awards of attorney fees. *Cracker Barrel*, 284 S.W.3d at 308; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). Under the American rule, a party in a civil action may recover attorney fees only if it is authorized by statute, contract, or some other recognized equitable ground. *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005); *Kultura, Inc. v. S. Leasing Corp.*, 923 S.W.2d 536, 540 (Tenn. 1996). The decision to follow the American rule is based on public-policy considerations. *Cracker Barrel*, 284 S.W.3d at 308. "[A]s a general principle, the American rule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case." *Id.* at 309 (citing *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008)).

Contracting parties remain free to agree to allocate the responsibility to pay legal expenses caused by a breach in their contract, and these agreements are subject to the normal canons of contract construction. *Boiler Supply Co. v. Lunn Real Estate Invs., Inc.*, No. 01A01-9605-CH-00246, 1998 WL 684599, at *3 (Tenn. Ct. App. July 1, 1998). However, contract provisions awarding

attorney fees are strictly construed and will be interpreted to override the American rule "only when a contract *specifically* or *expressly* provides for the recovery of attorney fees." *Cracker Barrel*, 284 S.W.3d at 309 (emphasis in original) (citing *House*, 245 S.W.3d at 377 ("The American rule provides that a party in a civil action may not recover attorney's fees absent a specific contractual or statutory provision providing for attorney's fees . . . ."); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985) ("We continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery . . . ."); *Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App.1984) ("In the absence of an express agreement to pay attorney's fees for enforcement of a contract, such are not recoverable in Tennessee.")). Thus, if a contract does not specifically or expressly provide for attorney fees, the recovery of fees is not authorized. *See, e.g.*, *Cracker Barrel*, 284 S.W.3d at 311(holding that the contractual language—"[a]ll costs and expenses of any suit or proceeding shall be assessed against the defaulting party"—did not create a contractual right to attorney fees for the successful party in a lawsuit); *Kultura*, 923 S.W.2d at 540 (holding that the term "any loss" did not include an award of attorney fees). Moreover, even when a contract authorizes the shifting of legal expenses, such obligation is limited only to those instances specified in the contract. *See, e.g.*, *Clark v. Rhea*, No. M2002-02717-COA-R3-CV, 2004 WL 63476, at *2, *3 (Tenn. Ct. App. Jan. 13, 2004) (holding that a contract provision allowing the prevailing party to recover attorney fees in the prosecution or defense of a breach-of-contract action did not apply where the prevailing party brought a declaratory judgment action seeking avoidance of a non-compete clause in the agreement, rather than a breach-of-contract action).

The provision at issue here is entitled "Indemnification." The heading is not necessarily dispositive, because the Lease also specifies that "[t]he headings of the various Sections and

Schedules of this Lease have been inserted for reference only and shall not to any extent have the effect of modifying, amending or changing the express terms and provisions of this Lease." (Lease § 21.) The heading does, however, suggest that the parties intended to describe the Barker's obligation to indemnify NHC in the event of third-party litigation. The language of the section itself, distilled to its essence, supports that conclusion: "Lessee [the Barkers] shall defend all actions against Lessor [NHC] . . . with respect to, and shall pay, protect, indemnify and save harmless Lessor . . . from and against any and all liabilities, . . . expenses (including reasonable attorney's fees and expenses), causes of action, . . . or judgments of any nature to which Lessor . . . may be subject . . . arising from . . . a violation of this Lease. . . ." (Lease § 6.) In other words, this provision requires the Barkers to defend any action against NHC "with respect to" any claim arising from a violation of the Lease and to pay and "save harmless" NHC from and against any attendant expenses, including attorney's fees, arising from such claims. If, for example, NHC had become embroiled in litigation as a result of the Barkers' failure to pay property taxes as required by the Lease, this provision might have come into play. The Lease language clearly conveys an intent that the Barkers would be responsible for indemnifying NHC for any expenses and attorney fees that arise from third-party litigation, but it does not *expressly* and *specifically* require the Barkers to reimburse NHC for attorney fees incurred directly by NHC in a lawsuit against the Barkers for breach of the Lease.

This construction is supported by Tennessee case law finding that indemnification provisions in lease agreements generally should not be construed to allow recovery of attorney fees in actions to recover for breach of the lease. For instance, in *Eatherly Construction Co. v. HTI Memorial Hospital*, No. M2003-02313-COA-R3CV, 2005 WL 2217078 (Tenn. Ct. App. Sept. 12, 2005), the court held that an indemnification provision similar to that at issue here did not authorize shifting

attorney fees in a breach-of-contract action between the parties to the contract. In that case, the court

noted that the title of the relevant section, "Indemnification," provided the "first indication" that the

referenced section was, in fact, an indemnification provision. *Id.* at * 10. That provision stated in

relevant part:

> [T]he Contractor shall and does agree to indemnify, . . . and hold harmless the Owner, . . . from and against all claims, damages, losses, . . . causes of action, . . . and expenses (including attorney's fees) of any . . . description, directly or indirectly arising out of, caused by, or resulting from . . . (1) breach of any of the Contractor's covenants, agreements, obligations or duties under the Contract Documents. . . .

*Id.* Noting that the words expressing parties' intentions in a contract are to be given their usual,

natural, and ordinary meaning, the court found that the owner's proposed interpretation, requiring

the contractor to "assume and conduct [the owner's] defense" in a breach-of-contract action brought

by the contractor, would produce an absurd result. *Id.* at *11. To avoid such a possibility, the court

held that the indemnification provision "only applies if and in the event a third party makes a claim

based upon a breach of contract by [the contractor] for which [the owner] could be liable. Such a

scenario cannot occur in a two-party action between [the owner] and [the contractor]." *Id. See also*

*Holcomb v. Cagle*, 277 S.W.3d 393, 397–98 (Tenn. Ct. App. 2008) (holding that a lease provision

requiring the defendant/lessee to indemnify and hold harmless the plaintiffs/lessors from "any cost,

loss, damage or expense arising solely out of any failure of the Tenant to comply with any of the

requirements or provisions of th[e] Ground Lease" would authorize the recovery of fees and

expenses incurred in connection with a dispute with a third party but not in a dispute between the

landlord and tenant, because the lease did "not explicitly provide for recovery of attorneys' fees in

enforcing its provisions"); *Colonial Pipeline Co. v. Nashville & E. R.R. Corp.*, 253 S.W.3d 616, 624

(Tenn. Ct. App. 2007) (affirming the trial court's denial of attorney fees to the prevailing defendant

railroad company, finding that the contract provision requiring the plaintiff to "indemnify and save

harmless [the Railroad] from and against all claims [and] suits" applied only to suits brought by third parties and that, "[i]ndeed, application of this indemnity provision to a contract dispute between the contracting parties would yield an absurd result").[7]

Likewise, this Court finds that the attorney-fee clause embedded in the Lease's indemnification provision does not explicitly authorize fee-shifting in the event of a direct breach-of-contract action between the parties to the Lease. To hold otherwise would lead to an absurd result. NHC's motion for summary judgment on its claim for attorney fees associated with its claims for recovery of past-due rent and late fees will therefore be denied with prejudice.[8]

## IV. CONCLUSION

For the foregoing reasons, the Court will deny the Barkers' Motion for Partial Summary Judgment (Doc. No. 18) in its entirety, on the basis that the questions of whether NHC is barred by equitable estoppel or waiver from recovering property taxes present issues to be resolved by a jury.

The Court will grant in part and deny in part NHC's Motion for Partial Summary Judgment (Doc. No. 19). More specifically, the Court will grant judgment in favor of NHC on its claim for past-due rent in the amount of $53,628 plus interest at the contractual rate of 7.25% per annum.

---

[7] To the extent the holding in *Linden v. Am. Storage Park*, C.A. No. 877, 1990 WL 6836, at *5 (Tenn. Ct. App. Jan. 31, 1990), an unpublished decision in which the Tennessee Court of Appeals approved an award of attorney's fees to an indemnitee against claims by an indemnitor without discussion of the "absurd result" identified in *Colonial Pipeline*, conflicts with the logic or holdings of *Colonial Pipeline* and *Holcomb*, the Court relies upon the subsequent published decisions in *Colonial Pipeline* and *Holcomb*. *See* Tenn. Sup. Ct. R. 4(G); *Fortune v. Unum Life Ins. Co.*, 360 S.W.3d 390, 398 (Tenn. Ct. App. 2010). *Accord Bowen v. Paisley*, No. 3:13-cv-0414, 2014 WL 2708499, at *2 (M.D. Tenn. June 16, 2014) (Trauger, J.).

[8] This determination does not resolve the question of whether the Barkers might be liable for attorney fees in connection with the alleged breach of their obligation to purchase the Property, which is covered by its own separate attorney-fee provision and is not the subject of the parties' motions. (*See* Lease ¶ 19.5(a).)

The Court will deny without prejudice NHC's motion for summary judgment on its claim for property taxes, as the issues of waiver and estoppel present jury questions.

The Court will deny NHC's motion insofar as it pertains to late fees, on the basis that the question of whether NHC has waived its right to recover late fees must likewise be resolved by a jury. The Court does not reach the question of whether the Barkers would be liable for interest on any late charges.

And finally, the Court will deny with prejudice NHC's motion for summary judgment on its claim for attorney fees. The Lease does not entitle NHC to recover attorney fees associated with its suit against the Barkers for breach of the Lease.

An appropriate order is filed herewith.


_Todd Campbell_
TODD CAMPBELL
UNITED STATES DISTRICT JUDGE